**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OR ARKANSAS**
**HARRISON DIVISION**

**THOMAS RILES**                                                          **PLAINTIFF**

**V.**                                        **CASE NO. 3:23-CV-3044**

**CARROLL COUNTY, ARKANSAS;**
**DEPUTY ANTHONY SCOTTI; and**
**OFFICER LARALYN KOSTER**                                **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

**TABLE OF CONTENTS**

I.  BACKGROUND ....................................................................................... 2

   A.  Riles's Condition ............................................................................. 2

   B. Traffic Stop ...................................................................................... 4

   C.  Detention at the CCDC ................................................................... 5

   D.  Post-Release Medical Treatment ................................................... 8

   E.  Other Hospitalizations .................................................................... 9

II.  LEGAL STANDARD .............................................................................. 10

III.  DISCUSSION ....................................................................................... 10

   A.  Spoliation ...................................................................................... 11

   B.  Deliberate Indifference Claims Against Individual Defendants...... 12

     *1. Deputy Anthony Scotti*.................................................................. 14

     *2. Deputy Laralyn Koster* ................................................................. 15

   C.  ADA and RA Claims Against Carroll County .................................. 18

IV.  CONCLUSION ...................................................................................... 22

## I. BACKGROUND

Now before the Court is a Motion for Summary Judgment (Doc. 47) filed jointly by the remaining Defendants. In 2021, Plaintiff Thomas Riles was arrested for speeding and other traffic offenses. He was detained for several hours at the Carroll County Detention Center. Riles has an uncommon ileostomy which requires specialized medical equipment to empty feces from the surgically created pouch inside his abdomen. The officers involved in his arrest and detention did not make that equipment available to him while he was in custody, he was unable to empty the feces from his internal ileostomy pouch for the duration of his detention, and the pouch was damaged such that Riles can no longer drain feces at will and must instead be permanently catheterized. He sued Carroll County and two of the officers involved for deliberate indifference to his medical needs and disability discrimination under the ADA and the Rehabilitation Act. Defendants move for summary judgment on all of Riles's claims. For the reasons stated below, summary judgment is **GRANTED IN PART AND DENIED IN PART**. The only claim that survives summary judgment is the deliberate indifference claim against Deputy Laralyn Koster.

### A. Riles's Condition

Thomas Riles has familial adenosis polypsosis, also known as Gardner syndrome. (Doc. 66, ¶ 14). Gardner syndrome causes excessive polyp growth in the colon which can result in colon cancer if the colon is not removed. *Id.* On June 23, 2010, Dr. Ernest Rehnke removed Riles's colon and created a Barnett Continent Intestinal Reservoir ("BCIR"). *Id.* ¶ 15. The BCIR is a pouch made of healthy sections of small intestine that is surgically created inside the abdomen after a person's colon is removed.[1] The pouch

---

[1] Riles objects to Defendants' use of medical journal articles to support their description of BCIRs because, Riles claims, such use does not fall within the learned treatise

holds feces and is connected by an access segment (a short section of small intestine to a stoma (a surgically created hole in the abdomen) through which the patient accesses the pouch. In order to keep the pouch from leaking feces, it is secured by a valve with a collar that wraps around the top of the pouch where the pouch meets the access segment. Once the pouch fills, the collar begins to fill, tightening around the valve. Because a BCIR needs to be intubated with a catheter, patients can control when they empty it. However, if a patient goes too long without emptying their BCIR and it becomes overly full, the valve can become difficult to intubate. This can result in damage to the valve (a so-called "slipped valve") requiring surgical repair or, left untreated, pouch rupture, which can result in life-threatening sepsis.

Between the creation of Riles's BCIR and the events giving rise to this lawsuit, Riles had four additional surgeries repairing or replacing part or all of his BCIR, most recently a collar and access segment revision in 2017. *Id.* at ¶ 16. In April of 2021, Riles typically emptied his BCIR about four times per day. If the stool was sufficiently liquid, Riles would use a catheter to empty the BCIR. If the stool was too solid, he would use a syringe to irrigate the BCIR with sterile water to help liquify it. He always carried several different types of catheters, a syringe, sterile water, and a bowl with him. He also had a vacuum pump for emptying the BCIR which he used periodically when he was experiencing indigestion as an alternative to repeated intubation because repeated intubation irritated his stoma.

---

exception to hearsay since it has not been called to the attention of either party's expert witness or established as a reliable authority. *Id.* at ¶¶ 11–13. However, much of Defendants' description is consistent with Riles and his expert's testimony about BCIRs, so, where the two are consistent, it does not appear that the structure or function of BCIRs is actually disputed.

## B. Traffic Stop

On April 5, 2021, Riles was pulled over on his way home from work for speeding. That morning, Riles had eaten breakfast at his home in Harrison and emptied his BCIR before 6 AM. He had a half-day training at his workplace in Springdale, about an hour-and-a-half's drive from Harrison. While at work, Riles intubated his BCIR during a break; gas escaped but no stool. After the training, Riles ate a sandwich and started the drive back to Harrison. He stopped at a gas station in Huntsville to get gas and drain his BCIR, but the restroom was out of service so he could not relieve himself. He knew there was another gas station with restrooms that he could use on his way home, about thirty-four miles from Huntsville in Alpena. He was uncomfortable from having not emptied his BCIR since the morning and drove over the speed limit to get to Alpena faster. *Id.* ¶¶ 23–34.

At 2:49 PM, Deputy Anthony Scotti of the Carroll County Sheriff's Office saw Riles driving 105 miles per hour in a 55-miles-per-hour zone. Scotti pulled Riles over and took his car keys, license, and registration paperwork. Riles alleges that he told Scotti he was speeding because he needed to get to a restroom urgently and lifted his shirt to show Scotti his stoma.[2] Scotti denies that Riles showed him his stoma, explained his medical condition, or told him that it was an emergency. Ten minutes after pulling Riles over, Scotti arrested Riles, put Riles in the back of the patrol car, and called for a tow truck to get Riles's car. (Doc. 47-3, ¶¶ 8–9).

---

[2] (Doc. 47-5, pp. 46:16–47:1 (Riles Depo.) ("I said, sir, I really need to get up to this restroom up here. I've got a medical situation. I lifted my shirt. And when I drive, I have a folded over Scott towel over it. It's more comfortable to drive that away. But regardless, I -- I lifted my shirt, and I lowered the Scott towel, and I showed him my stoma. And so I was like, I have a legitimate medical emergency, my stoma. At that point, there was where -- I don't know how it occurred, whether it was rough driving, but my stomach was bleeding, and I showed it to him.").

While they waited for the tow truck, Riles asked Scotti to get Riles's medical supplies out of Riles's car before it was towed. Scotti got a catheter from Riles's car, wrapped it in Scott towels, and put it in the patrol car. (Doc. 66, ¶¶ 35–37, 40–41). Scotti admits that he took these actions, which undermines his assertion that Riles did not explain his medical condition. (Doc. 47-3, ¶ 10). Scotti retrieved only one catheter, and did not get Riles's syringe, sterile water, or bowl from the car, although Riles testified that he explained where each item was in detail. (Doc. 47-5, 48:6–49:2). Scotti did not give Riles an opportunity to confirm that Scotti had gotten the correct medical supplies from Riles's car. (Doc. 74, ¶ 16).

Nearly an hour later at 3:46 PM—after the tow truck arrived for Riles's car—Scotti drove Riles to the Carroll County Detention Center ("CCDC") about twenty minutes away. When they arrived at the CCDC, Scotti gave Riles's catheter to the intake desk, and Riles told Scotti that he had gotten the wrong equipment. Scotti left the CCDC around 4:35 PM. (Doc. 66, ¶¶ 42–46).

### C. Detention at the CCDC

Riles was booked into the CCDC by Deputy Laralyn Koster. The "Intake Questioner and Property List," completed at 4:20 PM, asks "Is the Detainee aware of any SERIOUS Medical or Mental Issues?" and was completed "cathader [sic]." (Doc. 64-4, p. 25). The parties disagree about whether Riles or an officer filled out this form. (Doc. 66, ¶ 59).

During book-in, Riles was seen by CCDC Nurse Carrie Kauffman. Riles told Nurse Kauffman that he needed a catheter to drain his BCIR. One of the central factual disputes in this matter is whether Nurse Kauffman identified Riles's condition as acute. Riles testified that Nurse Kauffman told officers "OR him, transfer him, or release him. We cannot care for him here." (Doc. 47-6, p. 127:9–11). Nurse Kauffman testified as follows:

Q. Do you remember a gentleman coming into the jail back in April of 2021 with a sort of unusual gastrointestinal pouch?

A. I remember somebody asking me for a catheter for some unusual event, and I told them that we did not have any catheters of any sort and I would not be able to obtain any unless I ordered it -- ordered it through our Purchasing, if I could even get it. I told them that, you know, that's just more care than what I felt that we could provide, and he probably needed to go for a fit.

Q. Go for what?

A. A fit. To make sure that he is medically sound to be held at the jail, which means --

Q. What is a --

A. -- they would have had to -- they would have had to bring him over to a hospital in order to be evaluated by a physician --

Q. Uh-huh.

A. -- to say that his condition is or is not stable enough to be held at the jail.

(Doc. 47-7, pp. 13:12–14:9).

Q. How important did you think it was that a person with -- that had an ileostomy and had what they -- you described as an abnormal elimination of waste, have access to medical supplies?

A. Oh, it's extremely important. . . . I think it's very important that they have the -- what they need.

*Id.* at pp. 16:12–17:4.

Q. So on the evening in question here when Mr. Riles came in and required an unusual catheter, do you recall how you interacted with the deputies in that case?

A. I just remember telling them that we did not have the capabilities of taking care of something like that, and that is honestly all that I remember, just knowing that there was a catheter for elimination. I knew what we had in stock. We had absolutely nothing there that could have even attempted to relieve him, because we just did not have it. That was something that a physician would of had to have been able to see and evaluate.

There -- that's far above, you know, my training, because that -- that's something that -- I mean, I just -- I couldn't -- I -- I couldn't effectively take

care of it, only being there six hours a day, not knowing exactly what was going on with him, other than he needed to have that relieved. I -- I don't know what else to say.

*Id.* at p. 19:2–23.

Defendants contend that Nurse Kauffman's recommendation was "not an acute care visit to help drain his BCIR, but an evaluation to determine whether or not Riles could be held long-term." (Doc. 75, p. 4). Notably, the words "long term" do not appear in Nurse Kauffman's testimony. A reasonable jury could interpret Nurse Kauffman's diagnosis as urgent—Riles needed to be "evaluated by a physician" to determine whether "his condition [was] or [was] not stable enough to be held at the jail." A reasonable jury could also infer, based on the reference to Riles's stability, that this was not merely a concern about the long-term viability of housing him at the jail, but rather an immediate question about Riles's condition which, as Nurse Kauffman testified, was "far above . . . [her] training" and therefore required physician intervention. In applying the law below, the Court therefore indulges this reasonable inference in Riles's favor.

After he saw Nurse Kauffman, Riles was put in a holding cell. Some time later,[3] a male officer came to the cell and gave Riles the catheter that Scotti had retrieved from Riles's car. Riles asked about getting a syringe and sterile water from the nurse. The officer left, and Riles tried to intubate his BCIR with just the catheter but was not successful. Riles testified that attempting to intubate was so painful he vomited. (Doc. 47-5, 53:10–54:12).

---

[3] Riles testified that he thought it was an hour and a half before an officer came to check on him, but there was no clock in the cell. (Doc. 47-5, p. 53:5–22). Defendants assert that Riles's time estimation is unreliable. (Doc. 74, ¶ 33).

Riles was left in the cell until at least 9:00 PM and did not see Nurse Kauffman again despite "numerous" requests. (Doc. 66, ¶ 61; Doc. 47-6, p. 128:9–12). Koster booked out the three other detainees at the CCDC before reaching Riles. (Doc. 66, ¶ 60). When she began processing him between 9:00 and 9:30, she marked "No" for "Do you have a serious medical condition that may require attention while you are here? If yes, refer to medical staff," and "Does inmate have obvious visible signs or trauma or illness requiring immediate emergency of [sic] doctors care." (Doc. 47-4, pp. 4, 7). However, she marked "Yes" for "Does inmate have any other medical condition we should be aware of" and noted "Has cathader, releave stool [sic]." *Id* at p. 7. Koster and Riles both signed these forms. Riles was released on a $1,125 bond sometime after 10 PM. (Doc. 47-1, pp. 8, 51).

### D.  Post-Release Medical Treatment

After he was released, Riles was picked up by his then-girlfriend Kayla Dill. Dill drove him to Baxter Regional Medical Center ("BRMC") in Mountain Home, seventy-eight miles away, although there were closer hospitals open. He was admitted to BRMC around 1:30 AM on April 6, 2021. Notes from BRMC indicate that Riles told the nurse that he had "not been able to intubate since 5 AM th[at] morning, and th[at] evening, he was unable to get a catheter past. . . . He sa[id] he does feel nauseated but has not thrown up." (Doc. 66, ¶¶ 62–69). His numeric pain rating was recorded as a "4," but Riles testified that he had already taken opioid painkillers before he was asked. *Id.* at ¶ 69; Doc. 47-6, pp. 158:5–159:20. Staff at BRMC attempted to access his BCIR without success. *Id.* at pp. 159:21–161:2. At almost 5:00 AM, he left BRMC against medical advice because, Riles alleges, there would not be a gastroenterologist or colorectal surgeon available to treat

him for several hours, so he would get treatment sooner at a different hospital. (Doc. 66, ¶ 70; Doc. 47-6, pp. 150:5–10, 159:21–162:7).

Riles was admitted at Mercy Hospital Springfield (MHS), 106 miles from BRMC, at around 5:20 PM on April 6. (Doc. 66, ¶ 71–73). Riles testified that he did not remember what happened for much of April 6, including in the twelve hours between his visits to BRMC and MHS, because he had not slept, was heavily medicated, and was experiencing a lot of pain. (Doc. 47-6, pp. 150:21–151:8, 171:2–7). Doctors at MHS were ultimately able to access the BCIR and drain it. (Doc. 66, ¶ 73).

Riles testified that, after his release from MHS, he has had to keep a catheter in place permanently, rather than being able to drain his BCIR at will because he suffered a slipped valve from his time in CCDC custody. Post-CCDC, he has also had to maintain a primarily liquid diet and puree any solid food he may wish to eat to ensure the particles are small enough to pass through his now-permanent catheter. Permanent catheterization comes with the risk of stool leaking from the catheter. Before his arrest, Riles worked a sales job in the food and beverage industry. After his arrest, he lost business when he could no longer enter sterile food production facilities because of that risk. (Doc. 47-5, pp. 72:12–80:13).

### E.  Other Hospitalizations

Defendants also direct the Court to other instances where Riles has been hospitalized after not draining the BCIR for an extended period. Records from Riverview Regional Medical Center in Gadsden, Alabama reflect that Riles was hospitalized on June 8, 2013, after not draining his BCIR for thirty hours. (Doc. 47-9). Riles remembered this hospitalization, but he did not remember how long he had gone without draining his BCIR although he thought that thirty hours must have been recorded in error. (Doc. 47-6, pp.

242:23–244:17). Then, on April 19, two weeks after his arrest, Riles returned to MHS and reported that he was without access to a catheter for nine hours. (Doc. 66, ¶ 74).

## II.  LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Nat'l Bank of Com. of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999) (quoting Fed. R. Civ. P. 56). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).

The moving party bears the burden of proving the absence of any material factual disputes and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.  DISCUSSION

The Court first addresses Riles's argument that summary judgment should be denied as a spoliation sanction before turning to Riles's § 1983 claims against the individual officers and his disability discrimination claims against Carroll County. The

individual officers both assert qualified immunity, and Carroll County asserts that it cannot be held vicariously liable under the ADA and RA for officer conduct.

### A.  Spoliation

In his Response to Defendants' Motion, Riles argues that the Court should deny summary judgment as a sanction for spoliation of video evidence in this case. The CCDC has video cameras throughout the facility. The CCDC stores video for approximately 180 days after recording, at which point it is overwritten; the CCDC does not manually delete footage. If a video is requested before it is deleted, then the CCDC preserves it rather than allowing it to be overwritten. (Doc. 74, ¶¶ 1–5). On June 10, 2021, sixty-six days after Riles's arrest, his criminal defense attorney on the underlying traffic offense, Doug Norwood, submitted a request under the Arkansas Freedom of Information Act ("FOIA") for "ANY AND ALL VIDEOS FROM THE JAIL AND THE TRAFFIC STOP, INCLUDING ANY VIDEO WITH MEDICAL TREATMENT (Will be sending Medical Authorization)." (Doc. 64-2). Norwood did not send the Medical Authorization until September 30, 2021, 178 days after the arrest. (Doc. 64-3). The Carroll County Sheriff's Office responded the same day Norwood sent the Medical Authorization: "No jail video – video has been purged from system." *Id.*

Riles argues that Carroll County failed to preserve this evidence in violation of Federal Rule of Civil Procedure 37(e). Riles asks the Court to find that, at this stage, destruction of the video evidence should preclude summary judgment. Riles asserts that this would be a minor sanction which:

> requires no inquiry into the intent or motivation of the spoliating party, but instead merely construing the absent video evidence in a light that places all of the facts that could have been recorded on the video (almost every action that gives rise to this matter) as the summary judgment standard requires, in the light most favorable to the non-moving party.

11

(Doc. 64, p. 8). The Court fails to see how this requested relief in any way differs from the existing obligations on the Court to view the facts in the light most favorable to the non-movant and to not weigh the credibility of witnesses. Supposing that the absent video is entirely consistent with Riles's testimony regarding his time at the CCDC, the Court must nonetheless still look to the law to determine whether his testimony supports a cognizable claim against Carroll County. The Court will not suppose that the video would have presented facts more favorable to Riles's claims than his own testimony did. Nor will the Court preclude summary judgment, foregoing the legal issues in this case entirely, as a sanction for this alleged violation.

### B.  Deliberate Indifference Claims Against Individual Defendants

Riles asserts claims against Deputies Scotti and Koster for their deliberate indifference to his serious medical need under 42 U.S.C. § 1983.[4]

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . . it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). Pretrial arrestees, as opposed to convicted prisoners, are not protected by the Eighth Amendment, but the Due Process Clause of the Fourteenth Amendment affords them "at least as much protection." *Hall v. Higgins*, 77 F.4th 1171, 1178 (8th Cir. 2023) (quoting *Johnson v. Leonard*, 929 F.3d 569, 575 (8th Cir. 2019)). These due process limits include protection from jail officials' deliberate indifference to an arrestee's serious medical needs.

---

[4] In his Response, Riles abandoned his § 1983 claims against Carroll County. (Doc. 64, p. 11).

*Id.* To prove a deliberate indifference claim, an arrestee must show: "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." *Id.* The first prong is objective, and the second prong is subjective.

"An objectively serious medical need is one that is 'either obvious to the layperson or supported by medical evidence, like a physician's diagnosis.'" *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019) (quoting *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)). The existence of Riles's ileal pouch is plainly supported by medical evidence. Moreover, its existence would be obvious to a layperson who had seen Riles's stomach because of his visible stoma. Riles's need for supplies to drain his ileal pouch is also both supported by a physician's diagnosis and would be obvious to a layperson. And that need is "objectively serious"; Riles could not provide for a basic human need, "the ability to eliminate and dispose of [his] bodily wastes," *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 958 (8th Cir. 1994), without specialized medical equipment, and the withholding of that equipment "detrimentally impact[ed] his ability to function and put[ ] him at risk of harm," *De Rossitte v. Correct Care Sols., LLC.*, 22 F.4th 796, 803 (8th Cir. 2022) (finding a genuine fact issue regarding deliberate indifference where prisoner suffering from hearing loss alleged he was frequently left without functional hearing aids). And what's more, the CCDC's own nurse found Riles's need for access to medical supplies "extremely important." (Doc. 47-7, p. 16:12–19).

Defendants cannot seriously dispute that Riles's BCIR and the attendant medical supplies were a serious medical necessity. But they try, nonetheless, arguing that the objective prong requires a showing that the defendant "ignored an acute or escalating situation or that delays adversely affected the prognosis." (Doc. 49, p. 17 (citing *Dulany*

*v. Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997))). However, as the Court described above, a reasonable jury could conclude that Nurse Kauffman's statements indicated that Riles's condition was acute or escalating. *See infra* section I.C.

Defendants' argument about the individual officers' awareness of the acute or escalating nature of Riles's condition is better addressed to the second, subjective prong. To meet this prong, "a defendant 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hall v. Higgins*, 77 F.4th 1171, 1179 (8th Cir. 2023) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment . . . ." *Id.* (quoting *Dulany*, 132 F.3d at 1239). Because this prong is subjective, the Court must look at the mental state of each officer individually.

### 1. Deputy Anthony Scotti

Over a period of one hour and forty-six minutes, Deputy Anthony Scotti pulled Riles over, arrested him, held him in his patrol car until a tow truck arrived, retrieved some but not all of Riles's medical equipment from Riles's car, and left Riles and the retrieved equipment at the CCDC. During that time, Riles claims that he repeatedly told Scotti that he needed to go to a restroom or the hospital and that it was a medical emergency. Scotti denies this. Crediting Riles's testimony as the non-movant, the question is whether Scotti acted with deliberate indifference by failing to get Riles to a restroom or the hospital for nearly two hours. The Court cannot find that he did.

Unlike Deputy Koster, Deputy Scotti was not on notice of Nurse Kauffman's assessment as it had not happened yet. Instead, he had only the information Riles gave him. "This isn't a situation where officers essentially ignored an injured inmate for hours

as he lay motionless and unresponsive or failed to seek medical attention even though an inmate had 'screamed, howled, and banged his head against the door of his cell for some eight hours.'" *Reece v. Hale*, 58 F.4th 1027, 1033 (8th Cir. 2023) (first citing *Letterman v. Does*, 789 F.3d 856, 864 (8th Cir. 2015); and then quoting *Ryan v. Armstrong*, 850 F.3d 419, 425–26 (8th Cir. 2017)).

Given the relatively limited duration of Scotti's involvement, Scotti's attempt to retrieve Riles's equipment, and Riles's apparent condition at the time—responsive, ambulatory, in pain but not vomiting—Scotti could not have inferred that a substantial risk of serious harm existed in delaying medical care for the limited amount of time needed to await the tow truck and transportation to the jail. While that period may have ended up being longer than Scotti initially anticipated, there is no indication in the record that Riles's condition deteriorated during that period such that Scotti should have been prompted to act. "Perhaps [Scotti] could have done more. But [the Court] cannot consider [Riles's] claim through the lens of hindsight's perfect vision." *Id.* at 1034 (internal quotation omitted). The § 1983 claim against Deputy Scotti is therefore **DISMISSED**.

### 2.  Deputy Laralyn Koster

Contrary to Deputy Scotti, Deputy Laralyn Koster was on notice almost immediately following Riles's arrival at the CCDC that he had a serious medical condition for which the on-site nurse could not provide care. A reasonable jury could credit Riles's testimony and interpret Nurse Kauffman's statements as directing that Riles be sent to the hospital or released. And Koster does not dispute that she was aware of Nurse Kauffman's assessment. Koster nonetheless put Riles in a holding cell and booked him out last, after all three other arrestees who were at the CCDC. (Doc. 47-4, ¶ 6). After Riles was in the cell for some time, a male officer opened the cell door to find Riles had vomited,

at which point Riles heard and saw Koster laughing with the male officer about what to do with Riles. But instead of doing something—anything—they left him in the cell. (Doc. 47-5, pp. 68:16–69:15).

Moreover, although Riles testified that Koster had seen that he vomited, she took over an hour to process his release. Koster processed and released all three other detainees at the CCDC in the half-hour between 7:42 PM and 8:13 PM. (Doc. 47-4, ¶ 6). CCDC records reflect that she did not begin generating the paperwork for Riles's release until about an hour later, around 9:00 PM, and it took another hour or more before he was released, after 10 PM. A reasonable jury could find that Koster was subjectively aware of Riles's medical needs, and that, at least by the time she was laughing about him vomiting in his cell, she knew he was at a substantial risk of serious harm and chose to do nothing.

Koster asserts that even if she was deliberately indifferent to Riles's serious medical need, she is entitled to qualified immunity. Qualified immunity protects officials who commit constitutional violations from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Koster argues that she is entitled to qualified immunity because it was not obvious that she needed to have Riles sent to the hospital or book him out faster so he could get himself to a hospital. This argument once again turns on a disputed factual issue, namely a difference in interpretation of Nurse Kauffman's assessment.

"Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary

16

judgment." *Francisco v. Corizon Health, Inc.*, 108 F.4th 1072, 1077 (8th Cir. 2024) (quoting *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003)). Viewing Nurse Kauffman's testimony in the light most favorable to Riles, a reasonable jury could conclude that Koster was on notice that Riles needed to be hospitalized or released immediately because he was without access to "extremely important" medical equipment and the only medical professional on site, Nurse Kauffman, did not have enough training to determine whether "his condition [was] or [was] not stable enough to be held at the jail." (Doc. 47-7, pp. 14:1–9; 16:12–19, 19:16–17). "A medical assessment does not justify qualified immunity when officers ignore it." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 864 (8th Cir. 2006). While Nurse Kauffman's assessment may be susceptible of multiple interpretations, Koster ignored that assessment even when Riles's condition worsened to vomiting. "The clearly established principle from *Dadd* is that a complete failure to treat an extremely painful (or other serious) condition displays a reckless indifference to a serious medical need." *Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 363 (8th Cir. 2023) (citing *Dadd v. Anoka Cnty.*, 827 F.3d 749 (8th Cir. 2016)).

Koster not only failed to seek treatment for Riles's serious medical condition, she ignored it entirely. As Riles points out, he was only arrested for a misdemeanor, so Arkansas law permitted his immediate release without waiting for a bond setting. *See* Ark. R. Crim. P. 5.2(b). But Koster did not issue a citation in lieu of custody or alert someone who could. *See Foulks v. Cole Cnty.*, 991 F.2d 454, 457 (8th Cir. 1993) (denying qualified immunity where jail denied detainee's mother's request that he be allowed to see a doctor at her expense despite jail policy permitting detainees to see doctors at their own expense). Riles was also able to pay bond at the time he arrived at the CCDC and could

have had bond set and been booked out first to allow him to seek medical treatment sooner. (Doc. 47-5, p. 52:3–11). But Koster chose to process Riles last, prolonging his detention in a facility unable to attend to his urgent medical needs. A reasonable jury could even infer, based on the timing of the other detainees' releases, that she slow-walked Riles's. No reasonable corrections officer could conclude that doing nothing—neither seeking treatment nor expediting release—was a constitutionally permissible response to Riles's serious medical need. *See Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020).

Koster also points to Riles's delay in seeking medical treatment, arguing that "[n]o reasonable jury could find that Koster had the [sic] 'a mental state akin to criminal recklessness' under the 'totality of the circumstances' by failing to address Riles' inability to drain his BCIR with more urgency than Riles himself did" based on the fact that Riles did not go to the hospital closest to the CCDC. (Doc. 75, p. 6). Contrary to this assertion, the Court believes that a reasonable jury could find that Riles's decision not to go to the closer Berryville hospital reflected good judgment, not a lack of urgency because, as indicated by BRMC's failure to treat him, a hospital, like Berryville's, without a gastroenterologist available was not equipped to handle his condition. Moreover, what Riles would do upon release was not known to Koster at the time she failed to act and cannot therefore serve as a basis for her claimed immunity.

### C. ADA and RA Claims Against Carroll County

Riles also asserts claims against the County[5] for disability discrimination under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA"). Title II of the ADA prohibits disability discrimination in "the services, programs,

---

[5] In his Response, Riles abandoned his ADA and RA claims against the individual defendants. (Doc. 64, p. 11).

or activities of a public entity," 42 U.S.C. § 12132, and Section 504 of the RA prohibits disability discrimination by entities receiving federal funds, 29 U.S.C. § 794. "The ADA and the RA are 'similar in substance' and, with the exception of the RA's federal funding requirement, 'cases interpreting either are applicable and interchangeable.'" *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (quoting *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir.1998)). There being no dispute about the applicability of the ADA or RA to the CCDC, the analysis (or analyses) of these claims is identical.

To prevail on these ADA/RA claims, Riles must show that he is a "qualified individual with a disability and that because of his disability, he was excluded from participation in or denied benefits of the Jail's services, programs, or activities." *Hall*, 77 F.4th at 1181. Failure to make reasonable accommodations for a known disability is a form of prohibited discrimination under the ADA and RA. *Id*. Reasonable accommodations must be made, where necessary, to provide qualified individuals with "meaningful access" to programs or benefits. However, regulated entities are not required to provide requested accommodations that "constitute an undue burden." *Id*. A known disability triggers the duty to reasonably accommodate, and a regulated entity's failure to do so will impose liability regardless of whether the failure "was motivated by the disability." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004).

Riles asserts that his rights were violated because the CCDC failed to provide reasonable accommodations for his disability. Carroll County argues that its officers did not violate Riles's rights under the ADA or RA, but even if they did, the County is not liable for its officers' violations. The County does not dispute that Riles is a qualified individual or that provision of medical care is a program or benefit within the meaning of the ADA

and RA. The County asserts, however, that it was not obligated to provide accommodations that it did not know were needed, that whatever accommodations were requested were not reasonable, and that even if its officers did fail to provide reasonable accommodations, the County is not vicariously liable.

On this final point, the County directs the Court's attention to *Casey v. Cooper*, 2024 WL 1856176, at \*4–5 (E.D. Mo. Apr. 29, 2024), which held that there is no vicarious liability in ADA and RA cases. *Casey* and the Sixth and Eleventh Circuit cases it relies on instead apply the *Gebser* test to ADA and RA claims against local government entities. *Id.* at \*5; *Ingram v. Kubik*, 30 F.4th 1241, 1259 (11th Cir. 2022); *Jones v. City of Detroit*, 20 F.4th 1117, 1121 (6th Cir. 2021). In *Gebser*, the Supreme Court held, based on Title IX's remedial scheme, that a school district is not liable for a teacher's Title IX violations "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998).

Title II of the ADA incorporates the remedial scheme from the RA. 42 U.S.C. § 12133. Section 504 of the RA, in turn, borrows its remedial scheme from Title VI of the Civil Rights Act. 29 U.S.C. § 794a(a)(2). And, to close the loop, Title IX, which the Supreme Court interpreted in *Gebser*, "was modeled after Title VI of the Civil Rights Act." 524 U.S. at 286. The Court agrees with the *Casey* court that the Eighth Circuit would likely apply the *Gebser* test to municipal liability under Title II and Section 504.

Therefore, to prevail on his ADA/RA claims against Carroll County, Riles must prove that an official of the County who, at a minimum, had authority to institute corrective

measures on the County's behalf had actual notice of, and was deliberately indifferent to, law enforcement officers' failure to accommodate Riles. It is not clear from the record whether any such official exists here. Under Arkansas law, "the ranking officer on duty at the place of detention . . . may issue a citation in lieu of continued custody" for misdemeanor arrestees. Ark. R. Crim. P. 5.2(b). Thus, the ranking officer would, by law, have authority to release Riles in response to other jail officers' failure to seek medical care. However, nothing in the record identifies who that ranking officer at the CCDC was on the night of Riles's arrest, so the Court cannot determine whether they had notice of Riles's condition or jail officers' failure to accommodate.

The CCDC's own policies may also be instructive in identifying an appropriate official under *Gebser*. The "General Information" section of the CCDC's Medical and Dental Health policy states that "[m]atters of judgment regarding health care services will be the sole province of the staff nurse and the Facility Administrator." (Doc. 47-2, Ex. A, section I.1). The Facility Administrator on the night Riles was in custody is not identified in the record, nor is there any evidence from which the Court could infer that they were informed of Riles's condition or jail officers' decision to ignore it.

The policy further provides:

> Injured or sick detainees that require immediate treatment upon their arrival in the sally port shall not be accepted in the Detention Center, unless they have been medically treated and released by a doctor. Inform the arresting officer to transport his prisoner to the emergency room, or call for an ambulance.

*Id.* at section V.6. It is not clear from the policy who is responsible for telling the arresting officer to transport his prisoner. Finally, in the event of a medical emergency involving a detainee, the policy provides, "The Detention Officer confronted with the medical emergency will: 1) Notify the Shift Commander who will assess the situation and if

necessary notify the staff nurse. 2) Request assistance from EMS as directed by the Shift Commander." The CCDC records provided do not identify the Shift Commander, and here, too, there is no evidence from which the Court could infer that they were even informed of Riles's condition.

On this record, there is no evidence from which a reasonably jury could infer that an appropriate official of the County knew about and was deliberately indifferent to the CCDC's officers' failure to accommodate Riles's disability. The ADA and RA claims against the County are therefore **DISMISSED**.

### IV.  CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 47) is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is **GRANTED** with respect to the § 1983 claims against Carroll County and Deputy Anthony Scotti and the ADA and RA claims against all defendants. Those claims are therefore **DISMISSED**. Summary judgment is **DENIED** with respect to the § 1983 deliberate indifference claim against Deputy Laralyn Koster.

**IT IS SO ORDERED** on this 24th day of February, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE